Gerald LANGLEY, Appellant,

v.

The STATE of Texas, Appellee.

No. 12–86–0060–CR.

Court of Appeals of Texas, Tyler.

Feb. 6, 1987.
Rehearing Denied Feb. 27, 1987.

Eugene M. McElyea and Neil L. Durrance, Turner & Durrance, Crockett, for appellant.

Don Gordon, Dist. Atty., Crockett, and David P. Weeks, State Prosecutor, Huntsville, for appellee.

COLLEY, Justice.

Gerald Langley was convicted by a jury of aggravated kidnapping. The jury assessed his punishment at twenty-five years' confinement. We affirm.

The record shows that on October 15, 1984, Langley and approximately five other inmates of the Eastham Unit of the Texas Department of Corrections confined in the north solitary unit, "shorted" the electronic door locks on all individual cells in the solitary unit, thereby opening the automatic door locks on the barred inside doors of each cell. This group of inmates, acting together, but led by one Jack Knapp, overpowered corrections officer Ronald Willmon, the only officer on duty in that unit. Willmon testified that Knapp grabbed him around the neck and that Langley was standing right behind Knapp at the time. Willmon stated that another inmate, Danny Davis, opened his cell door and came out, and the inmates walked Willmon "inside the little cell there." Willmon further testified that he was blindfolded and that Davis and Knapp handcuffed his hands behind him; Knapp took his keys, gave them to Langley and told him to go lock all the doors to the cells of people they didn't want out.

Willmon testified that he was then led handcuffed and blindfolded to the hallway of the unit where he was seated so that he could be seen by prison officers and officials outside the solitary unit. Willmon stated that some prison officials came to a window opening of the unit on the outside of the solitary unit and were conversing with the inmates. He testified that he heard an unidentified inmate say that they needed a walkie-talkie so they could communicate. Then, according to Willmon, Knapp told Langley to "come over and sit down beside me, you know, to watch over me." Willmon's testimony also reveals that the inmates had found a wooden box in which there was a tape recorder. The box was locked with a padlock, but after the inmates were told that the box contained a tape recorder, the box was opened by the inmates; the tape recorder was brought to Willmon to record a message to the authorities at the prison unit. Knapp then told Willmon to state his name and

that he was all right. Willmon was further instructed to inform the prison officials that all the inmates wanted was a walkie-talkie and that "they better keep the door [to the unit] shut." Willmon testified that after he had recorded the message, the blindfold was removed, and he saw Knapp, Langley and three other inmates standing close to him. Langley was holding the tape recorder. Shortly after these events, Willmon related that a rescue team came through the front outside door of the unit firing tear gas and that he was released by Knapp who pushed him towards the door.

Bobby R. Boykin, another corrections officer, testified that he was alerted to the breakout of the inmates by an inmate trustee who was working as a porter in the solitary unit. Boykin stated that he opened the door and saw Langley and Knapp bringing Willmon out of a cell into an open area of the unit. Boykin testified further that Langley had his arm around Willmon's neck. Building Captain Robert H. Babic testified that while he was at the scene immediately outside the solitary unit, he could hear inmates shouting, demanding a walkie-talkie, and saying if they "didn't get them a walkie-talkie within five or ten minutes that they were going to kill Officer Willmon."

John L. Bonner, an assistant warden at the Eastham Unit, testified that after the breakout, he checked all of the cells and found that only the wiring in Langley's cell "had been pulled out of the conduit and tied together." Therefore, "the locks [on each cell] would automatically come open." Bonner testified that he and another warden talked with Langley and Knapp through a window opening of the solitary unit. He stated that Langley told them "that if we try to make assault we were going to drag out a dead boss." [1]

Langley presents four points of error. He contends by his first two points that the evidence is insufficient to sustain his con-

viction because the State failed to establish his criminal responsibility under the law of parties [2] or that by his own conduct he committed the offense in concert with the other actors. Langley also argues that the evidence is insufficient to establish that deadly force was used or threatened to restrain Willmon in order to prevent his liberation, as alleged in the indictment.

The elements of aggravated kidnapping, relevant to this case, are that a person (1) intentionally or knowingly (2) abducts (3) another person (4) with the specific intent to use him as a shield or hostage. Section 20.04(a)(2); *Phillips v. State,* 597 S.W.2d 929, 932 (Tex.Cr.App.1980). Langley argues that the record reflects that no "deadly force" [3] was used directly against Willmon and that no threats to use "deadly force" were communicated directly to Willmon to prevent his liberation. Therefore, Langley claims that the evidence is insufficient. We disagree.

■ It is true that no serious bodily injuries were inflicted on Willmon during the time he was restrained of his liberty, and neither Langley nor any other inmate directly threatened Willmon with the use of deadly force during the episode. However, Langley himself warned Warden Bonner, in effect, that Willmon would be killed if any attempt was made to liberate him. Such language constitutes an express threat to use deadly force against Willmon. As applicable to the facts of this case, section 20.01(2) defines "abduct" as follows: " 'Abduct' means to restrain a person with intent to prevent his liberation by; ... (B) *using or threatening to use deadly force."* (Emphasis added.) We construe this definition of "abduct" to include threats to use deadly force against the kidnapped victim made with intent to prevent his liberation whether they be directed to the victim, or to his would-be rescuers.

1. Prison slang meaning a corrections officer, namely Willmon.

2. Tex.Penal Code Ann. §§ 7.01(a), 7.02(a)(2) (Vernon 1974). All references hereafter made

in this opinion to sections are to the Texas Penal Code Annotated (Vernon 1974).

3. Langley in his argument adopts the definition of that term found in section 9.01(3).

The indictment, omitting the formal parts, alleged that Langley "did then and there intentionally abduct [Willmon] without his consent, with intent to prevent his liberation, by using and threatening to use deadly force on [Willmon] and with intent to use him as a shield or hostage." In the guilt-innocence phase of the trial, the trial court abstractly instructed the jury on the law of parties and then charged them on the application of the law to the facts of the case as follows:

Now, if you find from the evidence, beyond a reasonable doubt, that on or about the 15th day of October, 1984, in Houston County, Texas, that Gerald Langley did intentionally or knowingly abduct Ronald Wilmon, without his consent, with intent to prevent his liberation, by using or threatening to use deadly force on Ronald Wilmon and with intent to use him as a shield or hostage or that the defendant, Gerald Langley, acted with intent to promote or assist Jack Knapp in the commission of the offense of aggravated kidnapping of Ronald Wilmon, then you will find the defendant, Gerald Langley, guilty of aggravated kidnapping as charged in the indictment.

No complaint is made by Langley about either the indictment or the charge, and we perceive no unassigned error that should be addressed in the interest of justice. Our careful review of the evidence persuades us that rational jurors could have found the essential elements of the offense were established beyond a reasonable doubt based on Langley's own conduct. Therefore his points one and two are overruled.

■ By his third point, Langley contends that the trial court abused its discretion in overruling his motions for continuance and mistrial. As we understand the point, as well as the motions providing the basis for the complaint, Langley contends he was deprived of an opportunity to discover exculpatory evidence, allegedly recorded but edited out of an aural video tape made by officers of the Texas Department of Corrections during the breakout of Langley and the other inmates on October 15, 1984. After a careful review of the testimony offered by Langley in support of these motions and the State's evidence in opposition thereto, we conclude that the court's denial of the motions did not amount to an abuse of discretion. Point three is without merit and is overruled.

■ Finally, Langley complains that the court erred in overruling his objections to the testimony of Warden Bonner that Langley and Knapp were both members of an organization in the prison system called the "Aryan Brotherhood," described by Bonner during his testimony as a prison gang.[4]

■ We conclude that the objection is global in character, and therefore insufficient to preserve the error urged on appeal. Under point four, Langley also argues that certain testimony of Captain Babic[5] was

---

4. The questions, answers and objections in this respect were as follows:

Q Did you know both Inmate Knapp and Inmate Langley?
A Yes, I did.
Q Do you [know] what their relationship was?
MR. MCELYEA: I'm going to object to that, your Honor. I don't think that is anything material to this case.
THE COURT: The objection is overruled. You may answer the question. When counsel rises to make an objection, hold your answer until I rule on the objection.
MR. MCELYEA: I'm going to move for a mistrial if he's allowed to answer this question.
THE COURT: It will be denied. You can answer the question.

A (By the witness) Both of them are members of the Arian Brotherhood which is a racial organization in the Texas Department of Corrections, a prison gang.
Q And it's a racial organization?
A Yes, it is.
Q And they're both members of that organization?
A Yes.
Q Were there other members of that organization involved in this hostage situation?
A Yes, Crosby and some other ones that were back there.

5. Langley mistakenly states that Officer Boykin gave the challenged testimony.

erroneously admitted over his objection. Babic was asked on direct examination whether he had conversations with Langley. He stated in response that two or three days before the kidnapping, he had talked with Langley at Langley's cell in the solitary unit. Langley's counsel objected to the narrative form of Babic's testimony. That objection was sustained. Then State's counsel again asked Babic if he had a conversation with Langley. Babic replied in the affirmative. State's counsel then asked, "What did you discuss?," whereupon Langley lodged an objection as follows:

> MR. MCELYEA: I'm going to object to this. I don't know what he's getting into. It doesn't have anything—It's two days prior to the events in question. I object to it. I don't know what it is myself. I wish I knew, but I don't want him telling it, making up another story for this jury.

The objection was overruled. Before the question was answered, State's counsel asked a slightly different question, "What was the basis of your conversation ...?" Babic answered that he asked Langley if he wasn't "tired of living" in solitary confinement and if he was "planning on spending ... the rest of [his] time" in the Department of Corrections confined to the solitary cell block. Langley again objected, stating, "This is highly inflammatory, what he intends to do and what he plans to do." This objection was likewise overruled, and Babic testified that Langley stated, "Not really. I've got a surprise here for you in a couple of days." We conclude that this objection was likewise too general to preserve error. Nevertheless, we shall address the merits of the point.

We conclude that the testimonies of Bonner and Babic, when tested by the appropriate standard of weighing probative value against any inflammatory aspects thereof,[6] were admissible. Neither the testimony that Knapp and Langley were members of the "Aryan Brotherhood" or Langley's statement to Babic that "I've got a surprise here for you in a couple of days," introduces evidence of an extraneous offense allegedly committed by Langley. Hence the general rule, excluding proof of such offenses,[7] has no application here. The record shows that Knapp had a prominent role in the kidnapping of Willmon. Any pre-existing relationship between him and Langley was certainly relevant. The statement of Langley to Babic, while not of overwhelming probative value, certainly lends some support to the State's allegation that Langley "intentionally or knowingly" abducted Willmon. We hold the opinion that the probative value of both Langley's statement and Bonner's testimony outweigh any improper prejudice to Langley's defense. Point four is overruled.

The judgment of the trial court is affirmed.

6. *See Albrecht v. State,* 486 S.W.2d 97, 99 (Tex.Cr.App.1972); *Lanham v. State,* 474 S.W.2d 197, 199 (Tex.Cr.App.1971).

7. E.g., *see Alvarez v. State,* 511 S.W.2d 493, 494–495 (Tex.Cr.App.1973).